UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRONT RANGE EQUINE RESCUE
2185 NW 114th Loop
Ocala, FL 34475

                     Plaintiff,

    v.

RYAN ZINKE
Secretary of the United States Department
of The Interior,
1849 C Street, N.W.
Washington, DC 20240,
sued in his official capacity

BRIAN STEED
Deputy Director, Policy and Programs,
Bureau of Land Management
1849 C Street, N.W.
Washington, D.C 20240,
sued in his official capacity

JEFFREY ROSE
District Manager, Burns District Office
Bureau of Land Management
28910 Highway 20 West
Hines, OR 97738,
sued in his official capacity

                   Defendants.

Civil Action No. 18-cv-2200

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1.    This case challenges a shocking decision by the federal agency responsible for caring for America's wild horses, to perform dangerous invasive "research" in the form of surgical sterilization of wild mares – including horses in various but unknown stages of pregnancy. This

radical departure from the bounds of science and humane treatment is unauthorized, uncalled-for, and illegal.

2.      Despite its statutory mandate to protect, manage, and control wild horse populations in the United States at the "minimal feasible level," the Department of the Interior's (DOI) Bureau of Land Management's (BLM) Burns, Oregon District Office has determined instead to conduct experimental sterilization surgeries on wild mares that BLM will round up and warehouse in Oregon in a corral with hundreds of other horses.

3.      This is the fourth time the BLM has stated its intent to surgically sterilize wild horses, and all three prior times, it has withdrawn its proposal when challenged.  The current plan to conduct sterilization research experiments is equally unjustified, unsupported, and unnecessary, and will cause unacceptable harassment, harm, and potentially death of the very horses BLM is obligated to protect.

4.      BLM claims that its proposed Mare Sterilization Program – given the euphemistic and macabre misnomer of "research" – is necessary to develop alternative methods for the control of wild horse populations.  BLM's decision to conduct these barbaric experiments on wild mares, however, is arbitrary and capricious and in violation of federal law, is unnecessary, and is especially inappropriate because alternative, nonsurgical, less invasive, and less risky fertility control tools are available, and have already proven successful in managing wild horse populations in Oregon and elsewhere in the United States.

5.      Plaintiff Front Range Equine Rescue (FRER) seeks a declaration from this Court that BLM's decision to conduct the Mare Sterilization Program is arbitrary, capricious, and should be set aside because it violates the Administrative Procedure Act ("APA"), 5 U.S.C § 702 and the Wild Free-Roaming Horses and Burros Act, 16 U.S.C § 1331 *et seq*., and an injunction to prevent

the BLM from moving forward with the Mare Sterilization Program.  Additionally, FRER seeks a declaration that BLM's failure to adequately consider the environmental impacts of the Mare Sterilization Program violates the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C § 702.

7.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A).  This civil action is brought against officers of the United States acting in their official capacities, and venue is proper in this district because Defendants Zinke and Steed in their official capacities reside here.  *Id.*  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. § 2201, *et seq.*  This Court may review Defendants' actions and order appropriate relief under both the APA and NEPA.

## PARTIES

8.      Plaintiff FRER is a 501(c)(3) nonprofit organization incorporated in Colorado. Established in 1997, FRER is dedicated to stopping cruelty and abuse of horses through rescue and rehabilitation.  FRER is actively involved in the rescue, rehabilitation, and adoption to good homes of domestic and wild horses, and in educational efforts regarding responsible horse ownership and wild horse roundups.  FRER has assisted thousands of horses through its rescue and educational programs.

9.      For over twenty years, one of FRER's primary goals has been to protect wild horses on federal public lands, by ensuring they are not subject to abuse, harassment, eradication, or mismanagement at the hands of the federal agencies charged with ensuring their long-term survival

and presence on those lands, as well as to protect and ensure the well-being of those horses captured and removed from federal lands and sent to long-term holding corrals or transferred from the Bureau of Land Management ("BLM") to (usually private) third parties.

10.     FRER's "Save the Wild Horses" campaign is dedicated to the protection of all wild horses, and includes regular provision of information to the public and partnerships with other wild horse groups.

11.     One of FRER's core activities is the rescue and rehabilitation of abused, neglected, and abandoned horses, whether domestic or wild.  FRER puts a substantial amount of its resources into this work.

12.     FRER also actively engages in education regarding the safe rehoming of horses who are in need of new homes, and FRER steps in to crisis situations such as natural disasters and large animal cruelty rescues, whenever it can.

13.     In order to keep its supporters informed, FRER expends significant time and resources investigating, monitoring, and reporting on the BLM's wild horse program.

14.     The Mare Sterilization Program was not a focus for FRER and not part of its investigation, monitoring and reporting, until the BLM first announced its first such program in 2016.  When the BLM dropped that plan, FRER again returned to its daily activities and goal-oriented work.

15.     Since the BLM announced that it would again be considering surgical sterilization as a management tool, FRER has been diverting its limited resources to investigate, evaluate, monitor, and assess the BLM's Mare Sterilization Program challenged in this action.  Its work has included scientific investigations and research and consultation with veterinarians and others in order to evaluate the program.  In undertaking these tasks, FRER has used its resources that it

would have used for other programs, if it were not for the BLM's illegal actions in authorizing and preparing to engage in the Mare Sterilization Program. Because of the Mare Sterilization Program, FRER has had to focus its attention on the BLM's illegal actions and its plans to begin this uncharted surgical experimentation, and has taken its resources away from other core FRER programs, including the Save the Wild Horses campaign.

16.     FRER will continue to monitor, evaluate, and investigate BLM's conduct with respect to its sterilization programs, and will continue to provide reports to its supporters about that conduct. These actions will continue to divert FRER's limited resources from FRER's other programs, including direct rescue work and assistance with rehoming and rescue of wild and domestic horses found in abusive situations.

17.     FRER has also repeatedly prepared comments on unjustified or harmful roundups conducted by the BLM, and other inhumane practices – like the Mare Sterilization Program – by the BLM. FRER's comments urge BLM and other responsible federal agencies to comply with federal law and to ensure that removals and any other federal actions taken with regard to wild horses are based on a legitimate need to undertake those actions, based on current data and evidence of the minimal feasible level of management, supported by and not in violation of applicable laws, that the horses' free-roaming nature is maintained, and that the wild horses' safety and welfare, including the herds' ability to maintain sufficient genetic diversity and viability, will be assured during and after those actions.

18.     FRER has diverted, and continues to divert, time, money, and efforts away from its other work in order to evaluate, research, investigate, and combat BLM's illegal conduct affecting wild horses, and it has specifically done so with respect to BLM's Mare Sterilization Program. Specifically, FRER has been forced to cut back on its rescue and rehabilitation programs because

of the BLM's decision to engage in the Mare Sterilization Program. Because of BLM's invocation of the Mare Sterilization Program, FRER has been and continues to be forced to expend its limited resources investigating and tracking BLM's unlawful actions. The resources that have been used in this regard would otherwise have been used for FRER's other campaigns and organizational goals, including its efforts to keep wild horses free from roundups and long-term confinement in BLM corrals, its adoptions of rescued horses or formerly wild horses to good homes, its sanctuary program permanently adopting and caring for horses, and its educational efforts regarding wild horse roundups, the cruelty of horse slaughter, and responsible horse ownership.

19.    FRER also has as a primary goal the prevention of horse slaughter for human consumption, and the education of the public about the dangers of horse meat for the public and the environment, as well as the cruelty inherent in horse slaughter operations. This is a national campaign of FRER's, which includes taking horses from auction yards who are on the way to slaughter, as well as providing ongoing information and consultation nationwide on the various issues relating to the slaughter of horses for human consumption.

20.    Because of the BLM's exploration of the possibility of engaging in ovariectomy via colpotomy, FRER has had to divert its resources away from its anti-horse slaughter campaign.

21.    FRER is uniquely poised to challenge Defendants' Mare Sterilization Program because of its particular focus on horses who are abused, neglected, abandoned, or dumped into the slaughter pipeline. The challenged action will further increase the burden on FRER to rescue wild horses, if they end up in auctions or being sold by the BLM.

22.    Defendants' actions challenged here impede FRER's programmatic work and frustrate its ability to pursue its organizational goals for several reasons. For instance, the planned sterilization procedures promote, normalize, and further inhumane treatment of wild horses, which

6

requires FRER to divert its limited organizational and programmatic resources to continue to monitor these activities. These resources would otherwise be spent on programmatic rescue and educational activities to protect wild and domestic horses, in furtherance of FRER's goals.

23.     There is a direct conflict between the Defendants' conduct – the inhumane, unnecessary, untested surgical sterilization of wild horses – and FRER's mission of protecting wild horses, both on the range and after they have left the range.

24.     Defendants' actions will also cause FRER to divert its programmatic and organizational resources to prevent an expansion of the Mare Sterilization Program, which BLM has already indicated it intends to pursue. FRER will be forced to expend additional resources investigating, evaluating, and educating the public about the BLM's planned activities, which are both illegal and inhumane. Since these resources would otherwise be spent on rescue, rehabilitation, and education, Defendants' unlawful conduct directly impedes FRER's activities, and causes a significant drain on its resources and time.

25.     The Burns District Office, BLM, and the Department of the Interior have inflicted and will continue to inflict economic injury on FRER, through a series of ongoing policies enacted and actions planned to be taken by BLM involving unacceptable, illegal, and inhumane surgical sterilization of mares in a manner that violates federal law and irresponsibly deals with wild horses.

26.     Defendants' actions have directly caused and perceptibly impaired FRER's ability to provide its supporters, the public, and other horses with assistance and education that FRER otherwise would have been able to provide were it not for Defendants' actions alleged here. Defendants' conduct has caused concrete and demonstrable injury to FRER's activities, and a consequent drain on its resources.

27.    FRER is directly impaired in its ability to engage in activities that protect domestic and wild horses, and has had to cut back on daily operations for its other programs, because of Defendants' adoption of the Decision Record in this matter.

28.    FRER has been, and will continue to be, forced to divert money and resources from other programs and projects in order to engage in activities that would otherwise not be necessary, were it not for BLM's decision to undertake the Mare Sterilization Program.

29.    BLM's decision to undertake the Mare Sterilization Program has forced FRER to dedicate resources and engage in various non-litigation, non-advocacy work in its effort to protect the mares who may be subject to the BLM's surgical research program.

30.    But for BLM's conduct challenged here, FRER would have devoted its time, resources, and funds to other organizational projects, such as public educational efforts on horse slaughter, wild horse management, and alternatives to the BLM's approach to wild horse issues, such as the use of PZP, and the development of other population control and long-term maintenance options for America's wild horses.

31.    FRER's injuries will be redressed if it prevails in this action, because if the Mare Sterilization Program is stopped, FRER will not need to continue to monitor this particular project and its proposed surgical sterilization of wild horses, will not need to consult with experts with respect to the viability and safety of such a program, and will not need to dedicate its resources towards educating the public about this program.

32.    Defendant Ryan Zinke is the Secretary of the Department of the Interior, the parent agency for the BLM, and is ultimately responsible for the Mare Sterilization Program.  He is sued in his official capacity.

33.     Defendant Brian Steed is BLM's Deputy Director for Policy and Programs, exercising authority of the BLM Director, and therefore is also responsible for the Mare Sterilization Program.  The BLM is an agency within the United States Department of the Interior. The BLM is responsible for the protection and management of wild horses under the Wild Free-Roaming Horses and Burros Act of 1971 (Wild Horse Act), 16 U.S.C § 1331 *et seq.*  The Wild Horse Act authorizes BLM to maintain ranges on public lands as sanctuaries for the protection and preservation of wild horses and burros.  16 U.S.C. § 1333.  He is sued in his official capacity.

34.     Defendant Jeffrey Rose is the District Manager for the Burns, Oregon District Office of the BLM.  In Oregon, BLM is charged with managing the public lands and resources through the Burns Field Office, in accordance and compliance with federal laws and regulations. The Burns Field Office prepared the NEPA and other documentation for and authorized the Mare Sterilization Program affecting wild horses in Oregon.  He is sued in his official capacity.

### LEGAL FRAMEWORK

#### *ADMINISTRATIVE PROCEDURE ACT (APA)*

35.     The APA provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action.  5 U.S.C § 702.

36.     The APA authorizes this reviewing Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (C), and (D).

37.     If a federal agency such as BLM implements a new policy which deviates from the status quo, the new policy is deemed arbitrary or capricious unless the agency displays awareness

that it has changed its policy and provides a reasoned explanation for why it believes the new policy is better than its previous position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

*National Environmental Policy Act*

38.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).

39.     In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]"  42 U.S.C. § 4331.

40.     In order to carry out the congressional declaration of NEPA's policy, the Federal Government is continually responsible to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without . . . undesirable and unintended consequences; [and] preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice."  42 U.S.C. § 4331(b)(1)-(4).

41.     NEPA's purposes encompass "[promoting] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" and "[establishing] a Council on Environmental Quality" ("CEQ") charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment." 42 U.S.C. §§ 4321, 4342.

42.     The Department of the Interior has established "procedures for the Department, and its constituent bureaus, to use for compliance with: (1) [NEPA]; and (2) The [CEQ] regulations for implementing the procedural provisions of NEPA [ ]."  43 C.F.R. § 46.10(a).

43.     The Department's procedures supplement, and are to be used in conjunction with, the CEQ regulations.  43 C.F.R. § 46.20(a).

44.     The CEQ regulations implementing NEPA mandate that "[f]ederal agencies shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects . . . upon the quality of the human environment," and "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."  40 C.F.R. §§ 1500.2(a), (f).

45.     CEQ regulations define the term "major federal action:"

> "Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility . . . (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals. . . .

40 C.F.R. § 1508.18.

46.     One common category of federal action is "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area.  Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities."  40 C.F.R. § 1508.18(b)(4).

47.     Where an agency is invoking a new procedure or program, such as the Mare Sterilization Program challenged here, NEPA review is required before that program can be invoked.

48.    CEQ regulations explain that evaluating whether an action "significantly" affects the environment requires considerations of both "context" and "intensity."  40 C.F.R. § 1508.27. For "context," the agency must consider the effects on society as a whole, the affected region, the affected interests, and the locality.  40 C.F.R. § 1508.27(a).  For "intensity" or severity of the environmental impact, the agency must take into account multiple considerations, among them: the degree to which the proposed action affects public health or safety; the degree to which the effects on the environment are likely to be highly controversial; the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; the degree to which the action may establish a precedent for future actions with significant effects; and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

49.    "Effect" is defined in CEQ regulations to encompass both direct and indirect effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative.  40 C.F.R. § 1508.8.

50.    NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is referred to as the Environmental Impact Statement ("EIS").

51.    An EIS ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA ensures that

important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  *Id*.

52.     Where the significance of environmental effects is unclear, the agency may first prepare an "environmental assessment" ("EA"), which must "provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact (FONSI)." 40 C.F.R. § 1508.9(a).

53.     Federal agencies must carefully consider relevant "detailed information concerning significant environmental impacts" and share that information with the pubic in the Environmental Assessment.  "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

### WILD FREE-ROAMING HORSES AND BURROS ACT

54.     In 1971, Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."  16 U.S.C. §§ 1331 *et seq*.

55.     The Wild Horse Act provides, *inter alia*, that viable herds of wild horses should remain on the lands on which they were found at the time the Wild Horse Act was passed, "as an integral part of the natural system of the public lands."  *Id.*  That is, barring compelling reasons to the contrary, wild horses are entitled to stay in their "herd area" — the "geographic area identified as having been used by a herd as its habitat in 1971."  43 C.F.R. § 4700.0-5(d).

56.     Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection." *Id.* § 1333(a).

57.     BLM has established "Herd Management Areas" (HMAs) — the geographic areas defined for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. The Warm Springs HMA is one such area defined for the maintenance of wild horses.

58.     Congress requires the agencies involved to preserve and safeguard the horses in a manner that causes the horses the least amount of interference. The Wild Horse Act provides that "[a]ll management activities shall be at the minimal feasible level . . . in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species." *Id.*

59.     BLM's own regulations mirror and amplify the statutory requirement that it engage in the least amount of interference with the wild horses that is necessary. The regulations mandate that management of the horses "*shall* be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

60.     Two of BLM's objectives in managing wild horses are the "protection of wild horses and burros from unauthorized capture, branding, harassment or death; and humane care and treatment of wild horses and burros. 43 C.F.R. § 4700.0-2.

61.     "Wild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a).

62.     "Management activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c).

63.     "The Bureau's objective is to use the best available science, husbandry and handling practices applicable for [wild horses and burros]."  BLM IM 2015-151, *Comprehensive Animal Welfare Program for Wild Horse and Burro Gathers* (Sept. 25, 2015).

64.     Section 1333(b)(1) requires the BLM to maintain a current inventory of wild horses and burros so that it can

> make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

*Id.* § 1333(b)(1).

65.     If BLM determines, based on reliable information, that there is an "overpopulation" of wild horses on public land, and only if the removal of "excess" animals is *necessary*, the BLM is entitled to remove them.  *Id.* § 1332(b)(2).  The agency can only take animals out of the herd who "*must* be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  *Id.* § 1332(f) (emphasis added).

66.     "Treating a wild horse or burro inhumanely" is a prohibited act.  43 C.F.R. § 4770.1(f).  While "sterilization" is an option for the BLM under the Wild Horse Act, the BLM's current program of sterilization is not contemplated by the Act, because the nature of the Mare Sterilization Program is insupportable, is not the minimal feasible alternative, is inhumane, threatens the health and safety of the horses who are the BLM's wards, and is arbitrary and capricious as a sterilization option.

FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

*The Mare Sterilization Program "Research" Project*

67.    In the Wild Horse Act, Congress charged BLM with the "protection, management, and control of wild free-roaming horses and burros on public lands."  P.L. 92-195 (Dec. 15, 1971); *see also* 16 U.S.C. § 1331 ("wild free-roaming horses and burros . . . are to be considered in the area where presently found, as an integral part of the natural system of the public lands").

68.    When the Wild Horse Act was passed, wild horses and burros were free-roaming on approximately 53.8 million acres of land.[1]  Today, the land available to these animals has been reduced to approximately 31.6 million acres.[2]  That reduction in their habitat range is a direct result of BLM's process of "management," removing nearly half of the wild horses' and burros' original range.

69.    BLM is charged with acting as the protector, on behalf of the American people, of wild horses, and must ensure that the actions it takes to manage wild horses actually benefit those animals, rather than benefitting only BLM or private interests.  Moreover, BLM is required to fulfill this Congressional mandate at the "minimal feasible level" of management.  16 U.S.C. § 1333.  Above all, BLM's actions must be consistent with the authority and purpose of the Wild Horse Act.  Congress explicitly expressed that BLM shall protect wild horses "from capture, branding, harassment or death."  *Id*.; 43 C.F.R. § 4700.0-2.  BLM also must manage to preserve the animals' "free roaming behavior" and as "self-sustaining populations."  43 C.F.R. § 4700.0-6. This legislative intent and regulatory commands illustrate that preservation of the *natural* state of

---

[1] BLM, Wild Horse and Burro Acreage, https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data (accessed Sept. 19, 2018).

[2] *Id*.

the herds and the individual animals and ensuring that the horses are not subject to harassment or other unnecessary devices are the core responsibilities of BLM under the Wild Horse Act.

70.     On May 21, 2018, BLM Burns District Office issued a Scoping Letter regarding its proposed "spay feasibility and on-range behavioral outcomes assessment" for the Warm Springs HMA.  BLM received communications from more than 2,000 individuals, groups, and agencies during the scoping period.

71.     On June 29, 2018, the BLM released the Mare Sterilization Research Preliminary Environmental Assessment DOI-BLM-ORWA-B050-2018-0016-EA.  BLM received 8,326 e-mails, letters, and faxes commenting on the Preliminary EA.  FRER submitted comments on the Preliminary EA.

72.     On August 8, 2018 Colorado State University (CSU), which had been a partner with BLM and the U.S. Geological Survey (USGS) on the Mare Sterilization Program Research Project, withdrew completely from participating in the project.  CSU issued a public statement about its withdraw, stating in part:

> As a state university, we have investigated alternative population and birth control measures for wild animals for more than 25 years, and remain committed to continuing to explore solutions to an unmet need. Our historic participation in these efforts involves consideration of many factors that are governed by internal and external experts in science, ethics and animal welfare. An important component of every research process is to engage in rigorous discussion and evaluation with our own experts as well as experts from outside of the university and listening to the concerns of the larger community as we bring these innovations forward. After careful consideration of multiple factors during the 30-day public comment period for the Warm Springs, Oregon, mare spay project, Colorado State University is withdrawing our partnership on the surgical spaying of mares. The project is led by the Bureau of Land Management and USGS.

73.     On August 22, 2018, BLM released an updated EA reflecting CSU's withdrawal. BLM received more than 10,000 comments on the updated EA.  The updated EA did not adequately address all of the comments FRER had submitted on the preliminary EA.  FRER

submitted additional comments on the updated EA and also incorporated its initial comments on the preliminary EA in its submission to BLM.

74.     On September 12, 2018, the BLM released the final Mare Sterilization Research Environmental Assessment (EA), DOI-BLM-ORWA-B050-2018-0016-EA ("Final EA"), along with its final Decision Record (DR) and Finding of No Significant Impact (FONSI).[3]

75.     As set forth in the Final EA, BLM proposes to immediately begin "research" to investigate the safety and effectiveness of surgical sterilization of approximately *one hundred* wild horse mares.  These mares are currently free-roaming in the Warm Springs HMA but would be rounded up, gathered and removed from the range, and segregated in long-term holding pens during the surgical sterilization process.  Some of the 100 sterilized mares would be returned to the range post-surgery, and Defendants claim they will be able to monitor the behavioral impacts of the sterilization on wild horses.  The remaining sterilized mares would be permanently removed from public lands.

76.     The Final EA sets out BLM's plan to assess a method of mare sterilization called *ovariectomy via colpotomy* (*ovariectomy*), which entails the removal of both ovaries, by first making an incision in the mare's anterior-dorsolateral vaginal wall. The incision is then enlarged with blunt dissection to perforate the protective layer of tissue around the abdominal organs (the peritoneum) and allow the veterinarian's hand to enter the abdomen of the mare.  (Final EA at 24.) Once the veterinarian accesses the abdominal cavity, s/he will blindly feel around for the ovaries, then insert a snare-like tool (a chain écraseur), which is looped around the tissue the veterinarian believes to be the ovaries.  The snare end of the écraseur is tightened around the ovaries, crushing

---

[3] A revised final FONSI was released by BLM on September 19, 2018.

the support structures and severing the ovaries from the mare's other organs.  The ovaries are then pulled out of the mare's abdomen through the vagina.

77.    The surgical procedure is at best risky, even when performed on individual mares in sterile, stable settings under the care of an experienced, trained, and skilled veterinarian. Ovariectomy via colpotomy can be hazardous in a temporary and unsterile setting such as the long-term holding facilities set up for captured wild horses and has not been performed in a field setting on such a large population size (approximately 100 mares) as BLM designed and proposed in the Final EA.

78.    Ovariectomy is a procedure that is performed, but it is recommended by most scientists and veterinarians for *domesticated* horses and then only as part of a laparoscopic-assisted procedure, in which the experienced and trained veterinarian can visualize the ovaries and other organs and structures within the vicinity of the ovaries.  "Flank laparoscopy is now commonly used in domestic mares due to its minimal invasiveness and full observation of the operative field." (Final EA at 42).  Ovariectomy via flank laparoscopy is "seen as the lowest risk method in terms of mortality and morbidity."  (Final EA at 42).  In contrast, in the National Research Council (NRC)'s Review of the Wild Horse and Burro Program (NRC 2013), the NRC noted that ovariectomy via colpotomy "has been seldom applied to free-ranging species."  "[T]he possibility that ovariectomy may be followed by prolonged bleeding or infection makes it *inadvisable for field application.*"  *Id*. (Emphasis added.)

79.    The BLM and its unidentified veterinarians (or other field staff) are *not* planning a laparoscopic procedure, but a blind cutting of organs that will only be palpated, and that the researchers will hope are ovaries, and not some other structures that should not be cut.

80.    BLM's intention to engage in the blind excision of wild mares' ovaries, with the hope that things work out, is dangerous, inhumane, potentially fatal, and arbitrary and capricious. Indeed, BLM admits that after sterilizing up to 34 mares to be released back onto public lands, it intends to perform blind ovariectomy via colpotomy "on approximately 70 more mares . . . in order to improve the quantification of the complication rate." (FONSI at 3; Final EA at 22.) BLM also refers to a 2% *mortality* rate from a 2016 study of surgical sterilization on feral mares and states that it "anticipates a similar complication rate for this study." (DR at 24.) This project amounts to insupportable experimentation on Congressionally protected wild mares, which BLM anticipates will have fatal impacts on some of the mares unfortunate enough to be targeted for the surgery.

81.    This procedure will be performed on pregnant mares in "various gestational stages." BLM proves the dangers of its "research" when it cites to the results of a 1979 study, that was not specifically focused on ovariectomy via colpotomy on wild mares, that showed that 100% of mares lost their pregnancies if sterilization occurred in less than 50 days since gestation; and that 45% of mares lost their pregnancies if the sterilization occurred between 50 and 70 days since gestation; and BLM presented no data whatsoever on how the mares would be affected if the sterilization occurred between 70 and 120 days since gestation. (Final EA at 68-69.) Obviously, the loss of a fetus in a pregnant mare can lead to many complications, yet BLM's plan ignores the virtual certainty of such complications.

82.    BLM admits that the potential complications – which range from excessive internal bleeding, intestinal trauma, and adhesions, to infections to death – remain unknown. (Final EA at 69.) BLM has not even identified what it considers "acceptable versus unacceptable effects of spaying" these mares. (DR at 18.) In other words, no matter what complications result, and how

frequently complications occur, from these experiments, BLM will be free to adopt a position that such complications are tolerable and acceptable, and thus BLM will be free to continue such "management" plans in the Warm Springs HMA and to expand surgical sterilization to other wild horse herds across the country.

83.    BLM's willingness to perform "research" on pregnant mares who remain wild, though captive in holding corrals, is a blatant violation of its obligations to these horses and a breach of federal law.  Rather than "living symbols" roaming free, these wild horses will instead become living *specimens* upon which unknown results – including painful and lethal complications – could be the ultimate consequences.  BLM has endorsed and agreed to fund this experimentation.

84.    After CSU withdrew from the Mare Sterilization Program, several of the Program's personnel were removed: "specifically, a professor of equine surgery, an animal welfare specialist, and a research scientist."  (Final EA at 20.)  Defendants do not explain the affiliations and experience and qualifications of any different personnel who might replace the relevant CSU participants.  Defendants have gone ahead with the experiment without at least three professionals that it previously identified to oversee and advise on the sterilization surgeries.

85.    The Defendants provide no information as to how there are multiple veterinarians whom BLM could contract who each have performed at least 100 of these surgeries and who are experienced in ovariectomy via colpotomy and standing sedation on wild horse mares — since there are limited instances of wild mares having had such a sterilization procedure.  (DR at 19; Final EA at 20.)

86.    After CSU's withdrawal and disassociation from the Mare Sterilization Program, Defendants have continued to rely on an "Institutional Animal Care and Use Committee" (IACUC)

Protocol from CSU.  The June 29, 2018 Draft EA[4] stated that the ovariectomy procedure was "presented to CSU's [IACUC]," and approved by CSU's committee, and that "CSU requires all research to exactly follow the methods approved in the protocol."  *Id*. at 20.  But Defendants concede, as they must, that "CSU's IACUC *will not be providing oversight on the surgery portion of the study*."  (Final EA at 19) (emphasis added).

87.     Because the CSU IACUC approved the procedures for the professionals identified in the application, that approval is void now that CSU has withdrawn from the project.  Without CSU's involvement, CSU's IACUC approval is meaningless.

88.     The BLM and its still unidentified veterinarians have not been reviewed, let alone approved, by the CSU IACUC to undertake this experiment.

89.     Because the BLM has not identified the veterinarians who will be doing the procedures, the public, including qualified veterinarians, has not been able to review the credentials of those professionals and provide comments on their ability to perform the planned procedures.  Without disclosure of the training and expertise of those performing the surgeries, Defendants have insulated from public scrutiny a crucial component of this already-risky procedure.

90.     BLM's unprincipled decision that approval by the CSU IACUC for the surgeries can simply be assigned from identified (and presumably experienced) CSU personnel to anyone that the BLM decides to have do these experimental surgeries is arbitrary and capricious.

---

[4] https://eplanning.blm.gov/epl-front-office/projects/nepa/107049/149639/183712/Spay_Feasibility_and_On-Range_Behavioral_Outcomes_Assessment_and__Warm_Springs_Herd_Management_Area_Population_Management_Plan_Environmental_Assessment.pdf.

91.    The decision to engage in what can hardly be called "research" is counterintuitive, dangerous, and unscientific.  It violates all principles of caution, care, and protection that BLM owes the horses by law, and ignores or accepts the myriad potential untoward and harmful results that could befall these mares.  The problems are only exacerbated by the fact that BLM is planning these procedures on wild mares who will have only minimal post-operative care and observation before being released back onto the range without any veterinarians, BLM, or other persons being able to ensure the mares do not develop or suffer from surgical complications.  BLM recognizes the surgery is "risky, and requires good post-operative care," but BLM plans to observe the 30 mares being returned to the range for only 7 days, after which time "no further veterinary interventions would be possible."  (Final EA at 10, 26.)

92.    In addition, the plan to have a "CSU animal welfare specialist experienced in observing, recording, and scoring based on a composite measure pain scale" conduct the post-surgical observations has been removed, since CSU withdrew from the experiment, and no similar experienced specialist has been identified in that person's place.  (Final EA at 32.)

93.    The BLM has planned, and then withdrawn, surgical sterilization for wild horses in the past.  In 2011, BLM withdrew its plans to castrate Wyoming wild horses when that was challenged.  The court, in dismissing the case, recognized that the sterilization procedures planned in that case — just like those now promoted — are of an "extreme and irreversible nature."  *Am. Wild Horse Preservation Campaign v. Salazar*, 800 F. Supp. 2d 270, 272-73 (D.D.C. 2011).  Facing a potential preliminary injunction against its castration plans, BLM notified the court that its decision to castrate the males had been abandoned, and instead, BLM would pursue fertility control treatment of the mares with a Porcine Zona Pellucida (PZP) vaccine.  *Id.*

94.      In 2012, again facing challenge to a surgical sterilization program, the BLM abandoned its efforts to castrate Nevada's wild horses.

95.      In 2016, BLM proposed a research experiment that included ovariectomy via colpotomy and other sterilization methods to be tested on more than 200 wild mares (Mare Sterilization Research EA DOI-BLM-OR-B000-2015-0055-EA (May 2016)).[5]  BLM's plans to sterilize the mares then were not carried out, due to vocal public opposition and legal action taken against BLM's radical plans, including action by FRER.  *See* Stipulated Voluntary Dismissal (Sept. 9, 2016), *Front Range Equine Rescue v. Jewell, et al.*, Case No. 1:16-cv-01521-CKK (D.D.C.) (defendants vacating decision record that had approved initiation of sterilization research on wild mares to be performed by Oregon State University).  With the challenged action here, BLM is attempting another illegal mass sterilization of America's wild horses.

96.      Defendants concede that they have not prepared an Environmental Impact Statement under NEPA.  (DR at 3.)  Moreover, Defendants recognize that they have not performed any detailed analysis of the following:

• The complications of ovariectomy via colpotomy performed on wild mares;

• The social and behavioral effect of the sterilized mares returned to the herd; or,

• The Mare Sterilization Program's effect on the genetic viability of wild horse herds such as the Warm Springs herd.

(Final EA at 30, 39-40, 66, 71-72; DR at 28-29; FONSI at 3.)

---

[5] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/56292/75587/83698/Final_Environmental_Assessment_-_May_2016.pdf.).  BLM proposed in the 2016 research project to monitor the spayed mares post-surgery for 14 days, which is double the time BLM now plans to monitor the Warm Springs HMA surgical subjects before they are returned to the range.

### *Estimated Costs of Mare Sterilization Program*

97.     Defendants estimate that the initial gather and removal of approximately 885 wild horses from the Warm Springs EA in the fall of 2018 will cost more than $500,000.  (Final EA at 115.)  The cost of simply holding all the gathered wild horses at the Oregon Wild Horse Corral is $5 per day per horse.  (Final EA at 111.)  Each ovariectomy procedure will cost $250-$300 per mare, for 100 mares.  (Final EA at 112.)  These are estimated costs *per each mare* and may not even include other required procedures such as ultrasound on the mares and additional testing.  *Id.* Of course, these costs will be incurred in addition to the current cost of managing wild horses and therefore cannot be within the "minimal feasible level" required for Defendants' management activities.  An additional estimated cost of $1,514 per wild horse will be incurred to radio collar and monitor the horses who are returned to the range.  (Final EA at 112.)

98.     If the Mare Sterilization Program project is set aside, there will be no increased cost to Defendants because they will continue to operate the Warm Springs HMA under existing policies and programs that have previously been approved and funded.[6]  The fact that the current experimental program *might* lead to future decisions by BLM with respect to managing other wild horse herds is not a sufficient basis for conducting unnecessary surgical procedures on living, federally protected wild horse mares.  No other alternative plan, such as the use of animal cadavers for this research, is contemplated in the Final EA.

---

[6] BLM speculates that not conducting risky surgical sterilizations could "eventually" become more expensive than carrying out the sterilization experiments but makes no attempt to quantify any such actual costs for future rangeland rehabilitation or current restoration costs (if the alleged overpopulation has caused rangeland impacts to date).  (Final EA at 114-115.)

### The Existing Policy: PZP

99.     A humane and scientifically-proven alternative -- the administration of Porcine Zona Pellucida (PZP) vaccine —is already used by, and available to, the BLM.  PZP is an effective and safe tool which is used to decrease reproduction and reduce wild populations. In contrast to the experimental procedure outlined in the Final EA, the PZP vaccine/contraceptive's application to wild horses *has* been thoroughly studied and proven effective in managing population growth and ensures wild horses' ability to remain in their habitat, free from surgical excisions, harassment, and harm, maintaining their free-roaming nature, and in a self-sufficient population.  BLM does not dispute that PZP is effective contraception for wild mares.

100.     PZP is noninvasive and requires only darting of mares.

101.     PZP can be administered by volunteer veterinarians who are ready, willing, and able to assist in darting mares.

102.     The use of PZP does not require the destruction of vital equine organs.

103.     The use of PZP does not have the potential to cause hemorrhage, internal injury, or death.

104.     The use of PZP does not require that wild horses be removed from the range or separated from their families.

105.     The use of PZP has less detrimental effect on wild horses than permanently removing the horses' reproductive organs.

106.     Defendants concede that "the use of PZP for fertility control is well documented" and it "could be useful in some scenarios."  (Final EA at 16.)

107.    PZP *has* been proven effective, has very few dangers, and does not threaten the lives of the horses or subject them to unnecessary surgery or surgical methods that do not meet contemporary standards of care.

108.    The only rationale BLM has given for not continuing the use of PZP is that administering annual boosters to the animals requires locating the animals every year, and that "access to animals for timely inoculation and other management restraints *may* affect the utility of PZP as a management tool."  (Final EA at 16 (emphasis added), 43-44.)

109.    Defendants further concede that the only negative impact setting aside the Mare Sterilization Program would have on Defendants is that "it would not be possible to conduct the research specified in the USGS financial assistance agreements."  (Final EA at 19.)  The fact that Defendants proceeded unlawfully and now must "de-obligate" funding for the agreements is not a sufficient basis for proceeding with the dangerous and irreversible procedures contemplated in the Mare Sterilization Program.

### The Mare Sterilization Program Violates the Resource Management Plan and BLM's Own Guidance

110.    The existing Resource Management Plan for the Warm Springs HMA is the 1992 Three Rivers Resource Area Management Plan (RMP) (Final EA at 2, 6)).  Defendants have not accounted for any changes in the governing RMP to reflect that the Warm Springs horses are being separated into treatment and control groups, and that the treatment group will now have permanently sterilized mares in its population.  (Final EA at 8.)  Given Defendants' directive that wild horses "shall be managed as self-sustaining populations," sterilizing groups of them is a drastic management change and one that must be accounted for in the governing RMP.  43 C.F.R. § 4700.0-6(a).

111.    BLM's *Wild Horses and Burros Management Handbook*, H-4700-1 (June 2010), provides that "LUPs [Land Use Plans] should also identify: [t]he HMAs to be managed for non-reproducing wild horses to aid in controlling on the range population numbers and the criteria for their selection . . . ."  (Final EA at 9-10.)  The handbook also defines non-reproducing wild horses as "[a]n HMA composed, *in whole or in part, of sterilized wild horses* (either stallions or mares) to aid in controlling on the range population numbers."  *Id.*  Despite Defendants' retort that it is not creating an *entirely* non-reproducing herd in this HMA (DR at 40), the Final EA creates a herd composed "*in part, of sterilized wild horses*," triggering the Handbook definition.

112.    BLM has not created a LUP specifying the criteria it used to determine that the Warm Springs HMA *should* be a "non-reproducing herd," as that term is defined in BLM's Handbook.  Such an LUP must be developed, publicly reviewed, and approved before BLM can permanently alter the Warm Springs HMA in a way inconsistent with the existing, governing Three Rivers RMP.

113.    BLM policy also states with respect to genetic sampling that "[i]n complexes or HMAs where separate breeding populations are thought to exist, each group of animals in a distinct population should be sampled separately.  Do not mix samples from different horses or different breeding populations."  BLM Instruction Memorandum (IM) 2009-062 (Jan. 15, 2009), *Wild Horse and Burro Genetic Baseline Sampling*, at 1-2.

114.    BLM plans to create two separate populations for purposes of this research experiment in the Warm Springs HMA.  (Final EA at 8.)  According to BLM's own policies, it must have baseline genetic diversity data from *each* of those separate populations, which it does not have.

115.    Genetic variability was recognized as an issue for analysis during the scoping period for this experiment.  (Final EA at 14.)  Genetic sampling last occurred in this herd in 2010, and BLM proposes to re-sample in 2025 at the soonest.  (DR at 28.)  BLM does not plan to do any genetic analysis of the horses in Warm Springs HMA during the next seven to eleven years.  (Final EA at 77.)

116.    "Reproducing WH&B [wild horse and burro] herd health is dependent, in part, on maintaining desirable genetic diversity (avoiding inbreeding depression)."  BLM H-4700-1, *Wild Horses and Burros Management Handbook* at 21 (Jul. 7, 2010).[7]

117.    BLM states that it conducts monitoring "to maintain adequate genetic variability," but it has no current data, and does not plan to use genetic data, before removing more than 600 wild horses permanently from the herd, and permanently sterilizing approximately 100 mares. These two management actions, separately and in combination, will drastically reduce the diversity of the genetic pool going forward.  (DR at 28.)

118.    Defendants' failures to collect genetic data now and rely on current genetic data, before these drastic "management" interventions, is what the NEPA process was designed and intended to prohibit: causing significant environmental effects on the herd, without knowing and sharing with the public what those impacts are before it is too late.

119.    Defendants' assertion that the Mare Sterilization Program "will not have significant environmental impacts beyond those already addressed in the Three Rivers [RMP]" overlooks the fact that Defendants' plan does not abide by that RMP in the first instance.  (FONSI at 9.)  The governing RMP did not contemplate managing the wild horses as a non-reproducing or partly non-reproducing herd.   The governing RMP also did not contemplate managing two separate

---

[7] https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_H-4700-1.pdf.

populations (a control and a test group, each of approximately 100 horses) without an understanding of the baseline genetics in each of the herds.

## CLAIMS FOR RELIEF

## COUNT ONE

(Violation of the Administrative Procedure Act)

120.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

121.    By authorizing the Mare Sterilization Program, Defendants have abused their discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

122.    Defendants' conduct is the legal and factual cause of Plaintiff's injuries alleged in this Complaint.

123.    Because Defendants' Mare Sterilization Program violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the APA.  Accordingly, the Mare Sterilization Program should be declared unlawful and be set aside.

## COUNT TWO

(Violation of the Wild Free-Roaming Horses and Burros Act)

124.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

125.    Defendants' determination to pursue the Mare Sterilization Program is unnecessary given the availability of an effective, safer, reversible alternative in PZP and therefore violates the

Wild Horse Act's requirement that Defendants' management activities "shall be set at the minimal feasible level." 16 U.S.C. §1333(a).

126.    Defendants' decision to implement the inhumane procedures of the Mare Sterilization Program violates their duties under the Wild Horse Act.

127.    In implementing its decision to conduct the Mare Sterilization Program, the BLM has determined that it prefers surgical sterilization over existing population controls such as PZP, because it will make it easier for BLM to manage the wild horse population.

128.    Defendants have violated the Administrative Procedure Act and the Wild Horse Act because they have failed to consider less risky alternatives and the lasting and potentially dangerous impacts of the Mare Sterilization Program.

129.    Because the Mare Sterilization Surgery will result in highly invasive and irreversible sterilization, it is by definition not the "minimum feasible level" of care for wild horses.

130.    Defendants' determination to pursue the Mare Sterilization Surgery additionally violates the Wild Horse Act's requirement that "free roaming horses . . . shall be protected from capture and harassment" and Defendants' own requirement that these wild horses be managed in "self-sustaining populations of healthy animals."

131.    Each and every one of these actions and omissions has injured and damaged FRER as set forth above.

132.    Because Defendants' Mare Sterilization Program violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the Wild Horse Act.  Accordingly, the Mare Sterilization Program and the Final EA should be declared unlawful and be set aside.

## COUNT THREE

(Violation of the National Environmental Policy Act)

133.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

134.    By authorizing the Mare Sterilization Program without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C) *et seq.*, and by issuing a FONSI concluding that their actions could not possibly have any significant impacts, Defendants have violated NEPA and CEQ's implementing regulations, and have acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq*.

135.    Neither the existing Resource Management Plan for the Warm Springs HMA (the 1992 Three Rivers Resource Area Management Plan (Final EA at 2, 6)), nor the Final EA fully analyzes or accounts for all the environmental and other impacts that Defendants are forcing onto this herd, with potential significant consequences, through a combination of the sterilization experiments and the post-sterilization behavioral observation research.  Without a fulsome analysis accounting for *all* potential significant impacts, the Final EA violates NEPA.

136.    The required EIS specifically must include descriptions and analysis of the following factors, and any alternatives to potentially significant environmental impacts: (i) impacts of the Mare Sterilization Program, as compared to alternatives such as PZP, with full cost comparisons between the Mare Sterilization Program, PZP, no action (cost of environmental restoration), and others; (ii) details of the identified, qualified veterinary personnel conducting the surgeries, or effects of conducting surgeries without qualified personnel; (iii) IACUC review and approval of the Mare Sterilization Program, now that CSU is no longer involved; (iv) the Land

Use Plan that must be developed for non-reproducing herds, including factors BLM considered in deciding to alter the Warm Springs HMA to be managed as a non-reproducing herd; (v) analysis of current genetic data of the two separate populations that will be created for the Mare Sterilization Program and behavioral research; (vi) the potential for the Mare Sterilization Program to be precedent-setting for future BLM wild horse and burro management actions across the country; and (vii) any irreversible and irretrievable commitments of resources which would be involved in the Mare Sterilization Program should it be implemented.  42 U.S.C. § 4332(C).

137.    By failing to adequately consider the impacts of the Mare Sterilization Program on the human environment, and by failing to consider the relevant CEQ factors, Defendants have failed to take the "hard look" at the impacts of their chosen action as required by NEPA. Accordingly, Defendants' actions and omissions have violated their obligations under NEPA.

138.    Defendants' decision to proceed with the Mare Sterilization Program before preparing an EIS violates both NEPA and CEQ's regulations as set forth above.

139.    Each and every one of these actions and omissions has injured and damaged FRER as set forth above.

140.    The Mare Sterilization Program and the Final EA should be declared unlawful and be set aside.

## RELIEF REQUESTED

Wherefore, FRER respectfully requests that this Honorable Court:

A.    Declare that Defendants have violated the Wild Free-Roaming Horses and Burros Act by authorizing the Mare Sterilization Program;

B.    Declare that Defendants have violated the Administrative Procedure Act by authorizing the Mare Sterilization Program and approving the Final EA, DR, and FONSI;

C.      Declare that Defendants have violated the National Environmental Policy Act by

authorizing the Mare Sterilization Program and approving the Final EA, DR, and FONSI;

D.      Enjoin Defendants from carrying out any aspect of the proposed Mare

Sterilization Program or Final EA, DR, and FONSI;

E.      Vacate the Mare Sterilization Program and the Final EA, DR, and FONSI;

F.      Award Plaintiff its costs and reasonable attorneys' fees; and,

G.      Award Plaintiff any other relief that is just and proper.


Respectfully submitted this 24th day of September, 2018

                                        SCHIFF HARDIN LLP

                                        /s/ *Jeffrey D. Skinner*
                                        Jeffrey D. Skinner, DC Bar No. 494808
                                        jskinner@schiffhardin.com
                                        901 K Street N.W., Suite 700
                                        Washington, D.C. 20001
                                        Telephone:  (202) 778-6400

                                        Bruce A. Wagman, CA Bar No. 159987
                                        (Will seek admission *Pro Hac Vice*)
                                        BWagman@schiffhardin.com
                                        One Market, Spear Tower, 32nd Floor
                                        San Francisco, CA 94105

                                        Molly L. Wiltshire, IL Bar No. 6310507
                                        (Will seek admission *Pro Hac Vice*)
                                        mwiltshire@schiffhardin.com
                                        233 S. Wacker Drive, Suite 7100
                                        Chicago, IL 60606

                                        Attorneys for Plaintiff
                                        FRONT RANGE EQUINE RESCUE